IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| WILLIAM AMES AND APRIL ANN AMES<br><br>v.<br><br>COLUMBIA PROPERTIES PHILADELPHIA, LLC, COLUMBIA SUSSEX CORPORATION, AND RENAISSANCE PHILADELPHIA | CIVIL ACTION<br><br>NO. 14-1253 |
|---|---|

**Baylson, J.**                                                                                                                           **April 29, 2015**

### MEMORANDUM RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this premises-liability negligence action, Defendants Columbia Properties Philadelphia, LLC, Columbia Sussex Corporation, and Renaissance Philadelphia[1] move for summary judgment (ECF 13) on Plaintiffs William and April Ann Ames' personal injury and loss of consortium claims stemming from an incident in which Mr. Ames, working as a security guard for a third-party security company and posted at Defendants' hotel, tripped and fell while disposing of old newspapers on hotel premises.

Defendants argue that they owed no duty to Mr. Ames because Plaintiffs have failed to show that Defendants were on notice of a possibly dangerous condition in the area where Mr. Ames's injury occurred and that Mr. Ames was aware it was dark outside but proceeded anyway. Alternatively, Defendants contend that Mr. Ames should be deemed an employee of Defendants under the "borrowed servant doctrine" and, accordingly, that Plaintiffs should be precluded from

---

1 According to Defendants' disclosures, Plaintiffs have incorrectly identified Renaissance Philadelphia as "Renaissance Hotel" and "Renaissance Philadelphia Airport."

1

recovery under the Pennsylvania Workers' Compensation Act, 77 Pa. Stat. Ann. § 1 *et seq.*, which bars tort actions that arise from any work-related activity.

Plaintiffs argue that Defendants, as owners of the premises, owed a duty to Mr. Ames and that the record evidence shows disputes of material fact as to whether Defendants had constructive notice of the adequacy of the lighting in the area where Mr. Ames's injury occurred. Plaintiffs also contend that the borrowed servant doctrine is inapplicable because the evidence shows that Mr. Ames worked for a third-party security company, not Defendants.

The Court concludes that there are disputes of material fact and will deny Defendants' motion for summary judgment.

## I. Facts and Procedural History

### A. Undisputed Facts

#### 1. The Incident

Mr. Ames was employed by Imperial Security ("Imperial") at the time of the incident leading to this litigation. ECF 13, Defs.' Br., Ex. C, Ames Dep. at 15:14-17:15. He had worked for Imperial for approximately two years and had been assigned to work at numerous locations, including Defendants' hotel, the Renaissance Philadelphia, located at 500 Stevens Drive in Essington, Pennsylvania. Id., Ex. B, Defs.' Answer ¶ 3.

On March 24, 2012, Plaintiff was injured when he tripped and fell on a concrete platform at night while taking old newspapers to a recycling bin outside the north side of the hotel. Id., Ex. C, Ames Dep. at 112:7-115:1, 145:1-149:23. Plaintiff, carrying the newspapers in a bag on his shoulders, exited the door on the north side of the hotel at night and walked down a set of stairs. Id. at 112:7-113:17. On the way to the recycling bin, Mr. Ames tripped over a concrete platform

2

three-to-four inches in height on which a dumpster was placed and suffered injuries to his wrist, hand, foot, ankle, and back.  Id. at 112:7-113:17.  He reported the incident to Imperial and took himself to the Emergency Room at the Hospital of the University of Pennsylvania.  Id. at 160:9-162:24.

Hotel General Manager Christopher M. Phillips, Defendants' Rule 30(b)(6) designee, identified a light over the rear door that Mr. Ames exited and two lights in proximity to the area of the incident that are triggered by photo sensors: one at the rear of the building and another on the adjacent eastern side.  Id., Ex. D, Phillips Dep. at 56:3-58:2.  There are also lights that illuminate the adjacent parking lots.  Id. at 57:24-58:2.

### 2. Mr. Ames's Employment

Security guards' primary responsibilities included patrolling the hotel and parking lot and maintaining general safety.  Id. at 50:2-51:4, 63:15-64:3.  The night hotel managers and other management personnel would direct security guards to different areas of the hotel to assist when needed.  Id. at 44:13-49:13.  Guards would also be directed to perform other tasks such as delivering guest bills, delivering newspapers, disposing of old newspapers, making shuttle runs to the airport, and cleaning rooms.  Id.  The hotel provided walkie-talkies to the guards so they could be contacted.  Id. at 41:4-11.  Imperial instructed guards to "do whatever managers told [them]."  Id., Ex. C, Ames Dep. at 26:23-27:18.  General Manager Phillips testified that management did not tell guards how to do their security work but used them all over the hotel when they were available.  Id., Ex. D, Phillips Dep. at 63:15-64:9.

When arriving for a shift, security guards would dial a call-in number to clock-in with Imperial and would "let the manager [at the hotel] know [they were] there."  Id., Ex. C, Ames

3

Dep. 219:17-18.  At the conclusion of a shift, guards would complete a Daily Activity Report (DAR), which documented what had happened during their shift.  Id. at 31:8-32:17.  The guards would submit the reports to Imperial with copies to Defendants.  Id. at 65:13-19.  When arriving for a shift, the guards would brief themselves on any issues at the hotel by looking through prior DARs.  Id. at 87:14-88:24.

Imperial paid the guards and instructed them to dress in a uniform that did not identify them as hotel employees.  Id. at 54:4-55:9.  Imperial provided the only training that the guards received as to how to be security guards before they worked on-site.  Id., Ex. D, Phillips, Dep. at 15:23-16:9.  The hotel provided no written materials to the security guards concerning how they were to perform their jobs.  Id., Ex. D, Phillips Dep. at 19:7-11.  Mr. Ames claimed he otherwise knew what to do from his experience working at other hotels.  Id., Ex. C, Ames Dep. at 95:8-14.  At one point, Imperial sent a supervisor to further train Mr. Ames in order to improve his job performance.  Id. at 94:10-95:1.

Imperial had the sole power to terminate a guard and was required to sign off on any request to replace a guard.  Id., Ex. D, Phillips, Dep. at 24:9-15.  If there was an issue with a guard, the hotel would discuss the issue with Imperial and Imperial would handle the matter.  Id. at 38:2-39:1.

Following his injury, Mr. Ames brought a Workers' Compensation claim against Imperial and collected $152,342.62.

**B. Disputed Facts and Issues**

    **1. The Incident**

Plaintiffs argue that Defendants had possession and control of the premises and that fact is sufficient to prove Defendants were on notice of the dangerous condition—the poor lighting in the area of the raised platform. Defendants contend that Plaintiffs need to prove Defendants had constructive notice.

The parties dispute whether Mr. Ames had previously been in the area where the incident occurred. Mr. Ames testified that he had never been to that area—the north side of the hotel—and was unfamiliar with it. Id., Ex. C, Ames Dep. at 107:18-108:3. Mr. Ames testified that prior to the incident he had always taken the same route to the recycling bin, exiting the hotel through a different door leading directly to a platform where he would discard the newspapers. Id. at 103:7-107:17. Mr. Ames further testified that a few days before the incident, a hotel employee informed him that he should no longer take this route because the door to the platform was to be alarmed. Id. at 105:4-16. Instead, Mr. Ames was instructed to exit a different door that led to the area on the north side of the hotel and to walk around to the recycling bin. Id. Mr. Ames further testified that security guards patrolled the parking lots on the west, south, and east sides of the hotel, but that they did not patrol the area on the north side of the hotel where the incident occurred. Id. at 30:8-32:23.

Defendants dispute this account because they contend that security guards patrolled the hotel parking lots and those patrols extended to the north side of the hotel. Defendants also dispute whether Mr. Ames always took the same route to the recycling bin.

The parties also dispute whether the area where the incident occurred was properly lit. Defendants argue the light over the rear door, the two lights triggered by photo sensors, and the lights from the adjacent parking lots were sufficient to illuminate the area. See id., Ex. D, Phillips, Dep. at 56:3-58:2. Plaintiffs contend that the lighting was insufficient. Id., Ex. C, Ames Dep. at 123:14-124:10. The parties also dispute the impact of Mr. Ames's possession of a flashlight at the time of the incident. Mr. Ames testified that the flashlight was ineffective in the rear of the hotel, but he proceeded anyway because taking out old newspapers was part of his duties. Id. at 125:1-126:24. Defendants argue that use of a flashlight shows Mr. Ames was aware of and assumed the risk of walking around at night in the area of the incident.

**2. Borrowed Servant Doctrine**

The terms and conditions of Mr. Ames's employment are at issue because the parties dispute whether Mr. Ames should be considered an employee of the hotel under the borrowed servant doctrine.

The parties dispute Defendants' control over Mr. Ames's work. Defendants contend that they controlled and directed the security guards at the property such that Mr. Ames should be deemed to have acted as a hotel employee. Plaintiffs contend that management did not tell guards how to do their security work—the guards' top priority—and only instructed them to perform other tasks to the extent they were available. See id., Ex. D, Phillips Dep. at 63:15-64:9. Plaintiffs also contend Mr. Ames was employed by Imperial, who paid him, had final say over whether to terminate him, and instructed him to dress so as not to identify himself as a hotel employee.

6

**C. Procedural History**

On January 20, 2014, Plaintiffs filed suit in the Philadelphia County Court of Common Pleas, alleging negligence and loss of consortium. On February 28, 2014, Defendants removed this action to this Court under 28 U.S.C. § 1441 based on diversity of citizenship. On December 15, 2014, Defendants moved for summary judgment (ECF 13). Plaintiffs filed a response on December 26, 2014 (ECF 15). On April 17, 2015, the Court held oral argument on Defendants' summary judgement motion.

## II. Summary Judgment Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Rule 56, the Court must view the evidence presented in the light most favorable to the non-moving party. Id. at 255.

## III. Analysis

**A. Plaintiffs' Negligence Claim**

Defendants argue that there are two reasons to grant summary judgment in their favor on Plaintiffs' negligence claim: (i) Plaintiffs have failed to show that Defendants had notice of a potentially hazardous condition in the area where Mr. Ames fell and (ii) Mr. Ames was aware it was dark outside and knew the area was dimly lit, but he proceeded anyway. The parties do not dispute that Pennsylvania law applies to this diversity action.

Under Pennsylvania law, the basic elements of a negligence cause of action are (1) a duty or obligation recognized by law requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interest of another.  Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2006).  Establishing that the defendant breached a legal duty is a condition precedent to proving negligence.  Shaw v. Kirschbaum, 653 A.2d 12, 15 (Pa. Super. Ct. 1994).

Pennsylvania courts have adopted the Restatement (Second) of Torts approach to determining the duty owed by a possessor of land to a person on his land.  See Kirschbaum v. WRGSB Assocs., 243 F.3d 145, 152 (3d Cir. 2001) (citing Carrender v. Fitterer, 469 A.2d 120, 123 (Pa. 1983)).  Under this approach, the standard of care a possessor owes to one who enters upon the land of another depends on whether the latter is a trespasser, licensee, or invitee.  See, e.g., Emge v. Hagosky, 712 A.2d 315, 317 (Pa. Super. Ct. 1998) (citing Jones v. Three Rivers Mgmt. Corp., 394 A.2d 546 (Pa. 1978)).

The parties dispute whether Mr. Ames was a licensee or an invitee.  The Court concludes that Mr. Ames should be classified as an invitee.  The Restatement (Second) of Torts gives three examples of licensees:  (1) one present upon the land for his own purposes, in which the possessor has no interest and to whom the privilege of entering is extended as a personal favor; (2) a member of the possessor's household; and (3) social guests.  Restatement (Second) of Torts § 330, cmt. h.  Mr. Ames falls into none of these categories.  Cf. Cresswell v. End, 831 A.2d 673, 676-77 (Pa. Super. Ct. 2003) (finding a water-meter reader injured on a private land was a licensee because he was permitted on land for a limited purpose in which possessor had no interest); Wiegand by

8

Wiegand v. Mars Nat'l Bank, 454 A.2d 99 (Pa. Super. Ct. 1982) (holding that a boy injured playing football on bank-owned land that the bank held open to the community was a licensee).

By contrast, the Restatement (Second) gives two examples of invitees: (1) those who enter as members of the public for a purpose for which the land is held open to the public; and (2) those who enter for a purpose connected with the business of the possessor. Restatement (Second) of Torts § 332, cmt. a. Mr. Ames, the employee of an independent security contractor, entered Defendants' premises for business purposes—to provide security at the hotel and to assist Defendants in other tasks related its operation. His entry upon Defendants' premises benefited Defendants. Moreover, Pennsylvania courts have held that employees of independent contractors are "invitees" who fall within the classification of "business visitors." See, e.g., Gutteridge v. A.P. Green Serv. Inc., 804 A.2d 643, 655 (Pa. Super. Ct. 2002) (holding that an independent contractor who suffered from asbestos-related injuries was a business invitee on defendants' premises).

"Possessors of land owe a duty to protect invitees from foreseeable harm." Carrender, 469 A.2d at 123. A possessor of land is subject to liability for physical harm to invitees only if the possessor (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees; (b) should expect that invitees will not discover or realize the danger, or will fail to protect themselves against it; and (c) fails to exercise reasonable care to protect invitees against the danger. Summers v. Giant Food Stores, Inc., 743 A.2d 498, 506 (Pa. Super. Ct. 1999) (citing Restatement (Second) of Torts § 343). However, a possessor of land is not subject to liability to its invitees if the invitees know of the condition and realize the risk. See Cutler v. Peck Lumber Mfg. Co., 37 A.2d 739, 740 (Pa. 1944).

In order to prevail on a claim of negligence, therefore, Plaintiffs must show that Defendants had notice of the harmful condition. See Myers v. Penn Traffic Co., 606 A.2d 926, 929 (Pa. Super. Ct. 1992). To establish notice, "[a]n invitee must prove either the proprietor of the land had a hand in creating the harmful condition, or he had actual or constructive notice of such condition." Estate of Swift v. Ne. Hosp. of Phila., 690 A.2d 719, 722 (Pa. Super. Ct. 1997). To determine whether Defendants had constructive notice of the harmful condition, Pennsylvania courts consider the following factors: (i) time elapsing between the origin of the defect and the accident; (ii) the size and physical condition of the premises; (iii) the nature of the business conducted thereon; (iv) the number of persons using the premises and the frequency of such use; (v) the nature of the defect and its location on the premises; (vi) its probable cause; and (vii) the opportunity which defendant, as a reasonably prudent person, had to remedy it. Lanni v. Pa. R.R. Co., 88 A.2d 887, 889 (Pa. 1952).

The following evidence, viewed in the light most favorable to Plaintiffs as the non-moving party, shows disputes of material fact as to the adequacy of the lighting, whether Defendants had notice of the allegedly deficient lighting, and whether Plaintiff was aware of the inadequate lighting and proceeded anyway:

- Plaintiffs argue Defendants had possession and control of the premises and that is sufficient to prove constructive notice. But Defendants contend the security guards were responsible for patrolling the entire exterior of the hotel and reporting any lighting deficiencies on the premises.

- Mr. Ames testified that he had never been in the area where the incident occurred and was unfamiliar with that area. See ECF 13, Defs.' Br., Ex. C, Ames Dep. at 107:18-108:3. Defendants dispute this assertion because they contend that the security guards patrolled the entire premises, including the area where the incident occurred. See id. at 30:1-32:17.

- There is disputed testimony about the lighting in the area of the incident. Mr. Phillips testified that the area where the incident occurred was lit by a light over the rear door,

10

    two other lights triggered by photo sensors, and lights from adjacent parking lots. Id. Ex. D, Phillips Dep. at 56:3-58:2. Defendants argue these lights were sufficient to illuminate the area. Plaintiffs contend that the lighting was insufficient to properly light the area. Id., Ex. C, Ames Dep. at 123:14-124:10.

- There is also disputed testimony regarding Mr. Ames's possession of a flashlight when the incident occurred. Mr. Ames testified that the flashlight was ineffective in the rear of the hotel and he proceeded anyway because Defendants had instructed him to take out the recycling. Id. at 126:1-126:4. Defendants argue that the use of a flashlight shows that Mr. Ames was aware it was dark and assumed the risk of walking around at night.

In light of these disputes of material fact, summary judgment is not warranted as to Plaintiffs' negligence claims.

**B. Borrowed Servant Doctrine**

Alternatively, Defendants claim that summary judgment should be granted because Mr. Ames should be deemed an employee of Defendants under the borrowed servant doctrine and Plaintiffs' suit barred by Pennsylvania's Workers' Compensation Act, 77 Pa. Stat. Ann. § 481(a). See Kline v. Arden H. Verner Co., 469 A.2d 158, 159-160 (Pa. 1983) (upholding the constitutionality of the exclusivity provision of the Workers' Compensation Act, which bars tort actions arising from work-related activity and limits recovery for workplace injuries to workers' compensation). "[T]he borrowed servant doctrine 'is an outgrowth of the common law rule that a servant who is loaned by his master to a third party is regarded as the servant of that party while under that third party's direction and control.'" Shamis v. Moon, 81 A.3d 962, 969-70 (Pa. Super. Ct. 2013 (quoting Mathis v. United Eng'rs & Constructors, Inc., 554 A.2d 96, 102 (Pa. Super. Ct. 1989)). The borrowed servant doctrine exists where an employee is "loaned" by an employer to a third party, who becomes the employee's master and controls the employee's conduct such that the employee is deemed to work for the third party. See Mathis, 554 A.2d at 102.

11

Under Pennsylvania law, "[t]he crucial test in determining whether a servant furnished by one person to another becomes the employe[e] of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it*." Mature v. Angelo, 97 A.2d 59, 60 (Pa. 1953) (emphasis in original); see also JFC Temps, Inc. v. W.C.A.B. (Lindsay), 680 A.2d 862, 864 (Pa. 1996) (reiterating the test set forth in Mature).  Furthermore, "[a] servant is the employe[e] of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually *exercises* that control or not." Id. (emphasis in original).  Pennsylvania courts also consider additional factors in determining whether to apply the borrowed servant doctrine, including "the right to select and discharge the employee, the skill or expertise required for the performance of the work, the payment of the employee's wages, and the duration of employment." Shamis, 81 A.3d at 971-72 (internal quotation marks and citations omitted).

The question of the servant's employer is a question for the Court "[w]here the facts are not in dispute, and the evidence leaves no sufficient ground for inconsistent references therefrom . . . ." Mature, 97 A.2d at 61.  But when there is an issue of fact or different inferences can be reasonably drawn, the question is for the jury.  Id.  In Mature, the plaintiff, the employee of a contractor, was injured by a machine rented, along with its operator, from defendant.  Id. at 62.  The court concluded that despite the contractor's instructions from time to time regarding where the work was to be done, there was no dispute of fact that the operator remained an employee of defendant, that defendant continued to direct the manner of operating the machine, and that defendant had the right to exercise control over the operator and machine.  Id. at 62-63.  The court cited to facts that indicated defendant supplied and trained the operator and the contractor never directed nor

12

interfered with the operation of the machine. Id. at 63; see also Williams v. Delta Truck Body Co., Inc., 892 F.2d 327, 330 (3d Cir. 1989) (reversing the district court's grant of summary judgment because of disputes of material fact about whether plaintiff possessed specialized skills that made him independent of defendant's right of control).

In Shamis, the court vacated a grant of summary judgment, concluding there was a dispute of material fact about whether plaintiff could be considered an employee of defendant under the borrowed servant doctrine. Shamis, 81 A.3d at 973. The court concluded that, while there was evidence showing defendant controlled the project, there was "significant evidence" that plaintiff was never under defendant's right of control with regard to the work to be done and manner of performing it. Id. at 972. The court also found each of the "additional factors" established by the Pennsylvania Supreme Court weighed against the defendants. Id. at 972.

Here, it is undisputed that Mr. Ames was legally an employee of Imperial, not Defendants, at the time of the incident. It is also undisputed that Imperial paid Mr. Ames, instructed him to dress in a uniform that did not identify him as a hotel employee, and had the sole power to terminate or replace him. It is also undisputed that, if Defendants had an issue with a guard, they would discuss the issue with Imperial and Imperial would handle it. These factors weigh in favor of a finding that the borrowed servant doctrine does not apply.

In spite of these factors, Defendants contend that the borrowed servant doctrine applies because—on the key issue—they had the right of controlling Mr. Ames's work and the manner of performing it. See Mature, 92 A.2d at 60. However, the following evidence, viewed in the light most favorable to Plaintiffs as the non-moving party, shows disputes of material fact over the extent to which Defendants had the right to exercise such control:

- Defendants argue that their personnel instructed Mr. Ames and other security guards to perform work around the hotel, including delivering guest bills, delivering newspapers, disposing of old newspapers, making shuttle runs to the airport, and cleaning rooms. See ECF 13, Defs.' Br, Ex. D, Phillips Dep. at 41:4-11, 44:13-49:13. Defendants also cite Mr. Ames's testimony that Imperial instructed guards to "do whatever the managers told [them]." Id., Ex. C, Ames Dep. at 26:23-27:18. But General Manager Phillips testified that management did not tell the guards how to do their security work but used them all over the hotel when they were available. Id., Ex. D, Phillips Dep. at 63:15-64:9. In light of Mr. Phillips testimony, Defendants arguably did not have the right of control over the performance of the guards' most important function—to provide security.

- The parties also dispute whether Mr. Ames and other guards were provided training and by whom. Mr. Phillips testified that Imperial provided the only training the guards received before they began working at the hotel. Id. at 15:23-16:9. Mr. Phillips also testified that the hotel provided no written materials to the security guards concerning how they were to perform their job. Id. at 19:7-11. At oral argument, however, Defendants' counsel indicated that Defendants provided at least some verbal instructions as to what guards were to do at the hotel.

Because this disputed evidence concerns the determinative factor for application of the borrowed servant doctrine—the right to control the work and the manner of its performance—the Court concludes that summary judgment is not warranted on this record. Accordingly, Defendants' motion for summary judgment on the borrowed servant doctrine will be denied.

### IV. Conclusion

Because there are disputes of material fact regarding Plaintiffs' negligence claim and the application of the borrowed servant doctrine, the Court will deny Defendants' motion for summary judgment.

An appropriate Order follows.

O:\CIVIL 14\14-1253 ames v. renaissance hotel\14cv1253.4.24.15.memo.MSJ.docx